**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLORADO**

| | |
|---|---|
| BRIAN FIRESTONE,<br><br>　　　　　　　　　　Plaintiff,<br><br>　　-against-<br><br>ALPHA STOCK INVESTMENT TRAINING CENTER LTD, COINBRIDGE PARTNERS LTD, JOHN SMITH, and RAYMOND TORRES,<br><br>　　　　　　　　　　Defendants. | Case No.: _____<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Brian Firestone ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

**<u>NATURE OF THE ACTION</u>**

1.　　Plaintiff brings this action against Alpha Stock Investment Training Center Ltd ("ASITC"), Coinbridge Partners Ltd ("Coinbridge"), John Smith ("Smith"), and Raymond Torres ("Torres") for violations of the Commodity Exchange Act, 7 U.S.C. §§ 9, 25, violations of Computer Fraud and Abuse Act, 18 U.S.C. § 1030, fraudulent misrepresentation, inducement, and concealment, breach of fiduciary duty, conversion, civil theft, breach of contract, breach of the implied covenant of good faith and fair dealing, and/or unjust enrichment.

2.　　Plaintiff was approached by ASITC and its leader, John Smith, in December 2024. They offered to teach and train Plaintiff on how to trade crypto currencies using their instructions and provided Plaintiff $500 of their capital with the opportunity for Plaintiff to keep any profits he made following their crypto trades. After some online research, Plaintiff agreed to participate in the trial offer and training.

1

3.       After creating an account on the Coinbridge cryptocurrency exchange platform, Plaintiff followed the trading signals provided by ASITC and Smith and executed the trades on the Coinbridge exchange. In just a matter of weeks, by following Defendants' instructions Plaintiff was able to generate approximately $55,000 in profits from the initial $500 stake—all on the Coinbridge platform.

4.       Defendants promised even greater returns if Plaintiff invested his own money and induced Plaintiff into investing via a false and misleading Investment Advisory Agreement executed on January 31, 2025 by which Plaintiff agreed to provide at least $50,000 of his own money to invest on the Coinbridge platform. Initially, the successful trading continued and Plaintiff's Coinbridge platform balance went to a high of nearly $2,000,000. But after several weeks, the previously successful trades failed and Plaintiff's account went all the way down to $12,000.

5.       To make up his losses, Defendants convinced Plaintiff to buy-in to a higher level of trading strategy that required an additional cash investment of $800,000 in outside capital. Defendants offered Plaintiff a deal to pay $470,000 in outside cash and accept a $330,000 loan purportedly in the form of the cryptocurrency USDT, a cryptocurrency known as a stablecoin with its value pegged to the US dollar. Shortly after joining the next investment tier, Plaintiff was once again making tremendously successful trades based on the instructions provided by ASITC and Smith—eventually increasing his account balance to as much as $24,500,000 on the Coinbridge platform.

6.       After exceeding the profit threshold for redemption requests, Plaintiff asked to redeem some of the value of his Coinbridge account balance. Defendants refused and, instead, sabotaged Plaintiff's largest trade, blocking his ability to exit a position on a highly leveraged

option-based cryptocurrency trade, causing Plaintiff to lose millions and his balance to go all the way to zero.

7.      Defendants convinced Plaintiff to accept a $1,000,000 loan purportedly in the form of the cryptocurrency USDT. However, this time, when Plaintiff's funds went back up, Defendants demanded repayment of the $330,00 "loan" in outside cash to allow Plaintiff to fully access to his account. Defendants would not allow Plaintiff to withdraw any of his balance from his Coinbridge account or make any repayments on his loans using his internal Coinbridge funds.

8.      After refusing to pay the additional cash requested, Defendants shut down Plaintiff's Coinbridge account and wiped his balance from over $6.6 million USDT to $0.

9.      The totality of the Defendants' conduct constituted a fraudulent scheme.

10.     For these reasons and as set forth in detail herein, Plaintiff seeks damages resulting from the Defendants' violations of law and equity, in an amount to be determined at trial.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raises federal questions under the Commodity Exchange Act and/or the Computer Fraud and Abuse Act.  This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

12.     This Court also has diversity jurisdiction pursuant to 28 U.S.C. §1332 as complete diversity of citizenship exists between the parties and the amount in controversy exceeds $75,000.

13.     This Court has personal jurisdiction over each Defendant because ASITC and Coinbridge are Colorado corporations located in the state of Colorado and Smith and Torres are each a director and/or officer of a Colorado corporation and have sufficient minimum contacts with Colorado as to render the exercise of jurisdiction over each Defendant by this Court

permissible under traditional notions of fair play and substantial justice.

14.     Venue is proper in this District under 28 U.S.C. § 1391, because ASITC and
Coinbridge are incorporated in Denver County, Colorado and Smith and Torres are each a director
and/or officer of Colorado corporation. Thus, at least one Defendant resides and/or has a place of
business in this County.  Venue is also proper in this Court because Plaintiff entered into a contract
with Defendants "governed by the laws of the State of Colorado."

## **PARTIES**

15.     Plaintiff is a citizen of Florida and a victim of Defendants' fraudulent scheme.

16.     Defendant Alpha Stock Investment Training Center Ltd ("ASITC") is a Colorado
Corporation with its principal place of business located at 1660 Lincoln St, Denver, CO 80264.
ASITC purports to be an investment advisor providing guidance on investment portfolio
management and financial planning.

17.     Defendant Coinbridge Partners Ltd ("Coinbridge") is a Colorado Corporation with
its principal place of business located at 950 S Cherry St, Denver, CO 80246. Coinbridge purports
to be a cryptocurrency exchange.

18.     Individual John Smith ("Smith") is the Chairman of the Board of ASITC.
According to the ASITC website, Smith founded ASITC in 2012 after working as an analyst at
Morgan Stanley and a vice president at Goldman Sachs. According to the ASITC website, Smith
received the "Financial Leader of the Year" award in 2012.

19.     Individual Defendant Raymond Torres ("Torres") purportedly "established"
ASITC and is the incorporator on record for Coinbridge. While Torres does not appear on the
ASITC website, he is listed as the point of contact in the numerous press releases created by
ASITC.

## FURTHER SUBSTANTIVE ALLEGATIONS

**I.      Background of ASITC and Coinbridge**

20.      ASITC purports to be a leading financial investment service organization, specializing in private equity, venture capital, and stock market investments. ASITC states that in 2017 the company launched its online education platform aimed at disseminating professional financial knowledge through online education.

21.      Coinbridge purports to be a leading cryptocurrency exchange based in the United States.

22.      On November 14, 2024, Coinbridge cured the delinquent filings of an entity registered with the Colorado Secretary of State as "UBS FINANCIAL GROUP" and officially changed the entity's name to "CoinBridge Partners LTD," changed the Registered Agent to Raymond Torres, and changed the address to 950 S Cherry St Denver, CO 80246.

23.      On November 25, 2024, Coinbridge filed a Form D Notice of Exempt Offering of Securities with the U.S. Securities and Exchange Commission. The Form D stated that Raymond Torres was an Executive Officer, Director, and Promoter. The Form D listed 950 S Cherry St Denver, CO 80246 as Coinbridge's principal place of business and 2446911521 as Coinbridge's phone number.

24.      The Form D stated that Coinbridge's revenue was over $100,000,000. The Form D stated that Coinbridge sold $10,000,000 in its security offering. The Form D stated that Coinbridge had 600 investors already invested in the offering.

25.      From November 2024 through at least January 2025, ASITC issued press releases soliciting potential customers/investors. For example, on November 28, 2024, ASITC issued the following press release:

Alpha Stock Investment Training Center (ASITC) Pioneering Financial Education with StarSpark AI

**United States, 28th Nov 2024 -** In the dynamic world of financial markets, the Alpha Stock Investment Training Center (ASITC) has emerged as a leader in providing innovative and comprehensive financial education. Founded by Raymond Torres, ASITC is dedicated to equipping individuals with the knowledge and tools necessary to navigate the complexities of the stock market. Central to ASITC's offerings is the StarSpark AI system, a cutting-edge platform that leverages artificial intelligence to enhance investment training and decision-making.

### The Genesis of ASITC

Raymond Torres established ASITC with a clear vision: to democratize financial education and empower individuals to make informed investment decisions. Recognizing the barriers that many face in accessing quality financial training, Torres aimed to create a platform that is both accessible and effective. ASITC's mission is to bridge the gap between theoretical knowledge and practical application, ensuring that learners are well-prepared to engage with the stock market confidently.

### Introducing StarSpark AI

At the heart of ASITC's educational approach is the StarSpark AI system. This innovative platform integrates advanced artificial intelligence technologies to revolutionize stock investment training. By analyzing individual learning patterns and real-time market data, StarSpark AI delivers personalized training modules tailored to each user's strengths and areas for improvement. This customized approach ensures that learners not only grasp complex concepts but also apply them effectively in real-world scenarios.

### Key Features of StarSpark AI

**Personalized Learning Paths:** StarSpark AI utilizes machine learning algorithms to assess each user's knowledge level, learning pace, and investment goals. This assessment enables the creation of customized learning paths that cater to individual needs, ensuring an engaging and effective training experience.

**Real-Time Market Analysis:** The system provides up-to-date information and insights by analyzing current stock market trends. This feature allows learners to apply theoretical knowledge to real-world market scenarios, bridging the gap between learning and practical application.

**Predictive Analytics:** By examining historical data and current market conditions, StarSpark AI employs predictive analytics to forecast potential market movements.

This functionality helps users understand market dynamics and develop strategies to navigate future market conditions.

**Interactive Simulations:** The platform includes interactive simulations that replicate real-world trading environments. These simulations enable users to practice investment strategies, understand market reactions, and refine their decision-making skills without the risk of financial loss.

**Continuous Feedback and Assessment:** StarSpark AI provides ongoing feedback through assessments and quizzes, allowing users to monitor their progress and identify areas for improvement. This iterative learning process ensures that users build a solid foundation in stock investment principles.



## Impact on Financial Education
The integration of StarSpark AI into ASITC's curriculum has significantly enhanced the learning experience for students. By offering a blend of theoretical knowledge and practical application, the platform prepares individuals to make informed investment decisions. The use of AI ensures that the training is dynamic, adapting to the ever-changing landscape of the stock market.

## Testimonials and Success Stories
Many users have attested to the effectiveness of ASITC's training programs. For instance, a recent graduate noted, "The personalized approach of StarSpark AI transformed my understanding of the stock market. I now feel confident in making investment decisions." Such testimonials underscore the center's commitment to delivering quality education that yields tangible results.

## Looking Ahead
ASITC continues to innovate, with plans to expand the capabilities of StarSpark AI. Future developments may include the integration of advanced AI models, incorporation of additional financial instruments, and the enhancement of user interfaces to provide an even more immersive learning experience. These advancements aim to further solidify the center's position as a leader in AI-driven financial education.



The Alpha Stock Investment Training Center, under the leadership of Raymond Torres, is at the forefront of revolutionizing financial education. Through the integration of the StarSpark AI system, ASITC offers a comprehensive, personalized, and practical approach to stock investment training. As the financial landscape continues to evolve, ASITC remains committed to equipping individuals with the skills and knowledge necessary to succeed in the world of stock investment.



For more information, visit their website at https://www.alpha2iota.com or contact them via email at service@alpha2iota.com.

Media Contact
Organization: Alpha Stock Investment Training Center

Contact Person: Raymond Torres

Website: https://www.alpha2iota.com

26.     On December 14, 2024, ASITC cured the delinquent filings of an entity registered with the Colorado Secretary of State as "9070 Maximus LLC" and officially changed the entity's name to "Alpha Stock Investment Training Center LTD," and changed the address to 1660 Lincoln St Denver, CO 80246.

27.     During this same time period in November – December 2024, ASITC also took over the website domain: https://www.alpha2iota.com. According to the Internet Archive, "WayBack Machine," the website domain: https://www.alpha2iota.com was inactive for years, until as late as October 2024.

## II.    Defendants Fraudulently Induce Plaintiff Into Their Scheme

28.     In December 2024, ASITC reached out to Plaintiff offering to teach and train Plaintiff on how to trade cryptocurrencies using their instructions and their $500 in capital with the opportunity to keep the profits.

29.     During the earliest days after contacting Plaintiff, ASITC offered to reward Plaintiff with points he could earn by completing "homework" or doing a daily check-in to drive continued engagement with Defendants. ASITC then offered to exchange points for raffle tickets where Plaintiff could, purportedly, win Bitcoin or ASI tokens, ASITC's own issued cryptocurrency. Representatives of ASITC told Plaintiff: "Currently, the ASI token is valued at $1.1, and as part of the Spark AI 5.0 Incubator, it holds significant potential for future growth. With Trump's endorsement and the booming development in the AI field, the potential for a huge appreciation is evident." When Plaintiff asked why he could not find ASI tokens on Coinbase, he was told that ASI tokens were only available on the Coinbridge Platform.

30.     Plaintiff performed online research and saw the ASITC website: https://www.alpha2iota.com. Plaintiff also performed Google searches, which populate press

releases, such as the one stated above.

31.    Plaintiff accepted Defendants' offer for a free trial period where he could learn how to trade cryptocurrencies on a risk-free basis.

32.    Plaintiff created an account on the Coinbridge platform and began making trades pursuant to Defendants' instructions on or about January 12, 2025.

33.    In just weeks, by following Defendants' trading instructions, the Plaintiff's Coinbridge platform balance went from $500 to over $55,000—a 12,000% increase.

34.    Defendants promised even greater returns and higher profitability trades to Plaintiff if he were to invest his own capital and join a higher investment tier, known as Stargate Command or SGC. SGC was part of ASITC's proprietary Starspark AI Enhanced-7 system stock/option and cryptocurrency market customization services.

III.    **Plaintiff Enters Into an Investment Advisory Agreement with ASITC and Coinbridge and Has Success Trading**

35.    On January 31, 2025, Plaintiff executed an Investment Advisory Agreement with Coinbridge, ASITC and John Smith whereby ASITC agreed to act as an investment advisor to provide professional investment advisory services based on the Plaintiff's objectives, risk tolerance, and financial needs. ASITC agreed to act in good faith, with due diligence, and in compliance with all applicable laws and regulations.

36.    Plaintiff agreed to provide complete and accurate information regarding financial goals, investment objectives, risk tolerance, and other relevant data.

37.    Coinbridge also joined and signed the Investment Advisory Agreement as the "Partner Exchange."

38.    Under the Investment Advisory Agreement, ASITC agreed to provide investment portfolio advice with a total asset return target of 400% during the agreed upon period of January

31, 2025 and May 1, 2025. ASITC agreed to develop an investment plan for Plaintiff, provide "paid investment advice services" to Plaintiff, recommend asset allocation strategies for Plaintiff, and grant Plaintiff "StarSpark&Stargate AI Stragic Partner" SGC1 level authority, and provide Plaintiff with "priority access to all primary market offerings on the CBP Exchange, including Fixed-Rate & Floating-Rate Bonds, High-Yield Bonds, IDO (Initial DEX Offering), IEO (Initial Exchange Offering), STO (Security Token Offering), and IGO (Initial Game Offering)" all while acting as a fiduciary "in the best interest" of Plaintiff "at all times."

39.     ASITC further agreed to be "responsible for losses due to market conditions or the performance of providing the client with portfolio investment advice."

40.     ASITC even guaranteed the results of the promised 400% return:

11.Indemnification
11.1 If, upon the expiration of the Agreement term, the total asset return target of 400% is not achieved under ASITC's investment recommendation strategy, ASITC shall compensate the Client for the difference in profits within one week following the termination of the Agreement.

41.     In exchange, Plaintiff agreed to invest at least $50,000 through ASITC and Coinbridge and pay a management fee. Plaintiff further agreed to maintain his investment for a 3-month cycle. In the event of an early redemption, Plaintiff agreed to pay an additional 30% fee on profits.

42.     After executing the Investment Advisory Agreement and sending AISTC the capital, Defendants continued to direct Plaintiff in successful trades on the Coinbridge platform. Below is an example of the conversations that would occur between Defendants and Plaintiff from February 2025:

4 February 2025

**BF**
**14:43**

**Brian Firestone**
Good afternoon Professor Smith, congratulations on your continuing successful trades this afternoon.

I really get the Cycle theory whereby major technological advancement results in 50 year cycles.

I want trading signals. Thx.

I'm prepared for the 5pm signal and look forward to a huge mutual success now and going forward.

I am very grateful to you and the entire team. This is a great place to be.
**J**
**15:47**
**John Smith**
Thank you for your message! I'm glad to hear that you resonate with Cycle Theory and are preparing for the 5 PM trading signal. Timing, discipline, and strategy are key to maximizing opportunities in these market cycles.

Stay sharp and ready-let's make this a highly successful session!

**BF**
**15:48**
**Brian Firestone**
I'm right with you .

**J**
**17:24**
**John Smith**
*Important Info:*
✅✅✅✅✅✅
*When you're doing contract trading, make sure to carefully check the following details to avoid unnecessary losses: contract name, leverage, order type, direction, contract quantity, etc. Here's the trade signal:*

*■■■■■■■■■■■■■■■■■■■■*
* 🎈 Contract: CBG/USDT*

* 🔑 Leverage: 100X*

* ⚡ Order Type: Market Order*

* 💵 Position:10%

* 📊 Direction:Sell/Short ⬆️ *

12

\*■■■■■■■■■■■■■■■■■\*

**17:36**
One-Click Close All

8 February 2025

**BF**
**12:30**
**Brian Firestone**
Good afternoon Professor, Quinn reached out to me and said you agreed to allow
me into the SH3 trade. Thank you. I'm ready.

**12:32**
SG3

**J**
**12:43**
**John Smith**
Ok

**BF**
**12:43**
**Brian Firestone**
👍

**J**
**12:43**
**John Smith**
■■■■■■■■■■■■■■■■
📍 Contract: NIMI/USDT

🔑 Leverage: 100X

💥 Order Type: Market Order

💵 Position: 35%

📊 Direction: Buy/Long ⬆️
■■■■■■■■■■■■■■■■

**J**
**13:27**
**John Smith**
One-Click Close All

**BF**
**14:26**
**Brian Firestone**
In reply to this message
Professor, I must thank you . My results were outstanding. Thank you for letting
me in to this trade today. 🙏
This is so exciting!
Like back in the day when I was [Personal details removed]

**BF**
**17:21**
**Brian Firestone**
[Personal details removed]. I feel that same exact energy again! It is a familiar
feeling. The world is truly our oyster.

Thanks to you, you mentors Lee and Patel, Quinn (the ever-amazing) and the
entire community, I am able to see that I am moving my goalpost forward.

Grateful to have found your opportunity: now I know how it opens up new,
proven ways of doing things that were foreign to me just a few short weeks ago.

Last but not least, the training, the courses, the market analyses' are all top of the
line, concise and to the point.

Again thanks for the trade today. It was eye opening.

Kindest regards,

Brian Firestone

**J**
**20:46**
**John Smith**
Trust me, this is just the beginning. There will be many more opportunities like
this in the future

**BF**
**20:59**
**Brian Firestone**
I am certainly looking forward to it! Have a nice night.

**J**
**21:04**
**John Smith**
Yeah, once you hit SGC3, you'll start getting used to these kinds of opportunities

43.     Over the course of the next several weeks, Plaintiff increased his Coinbridge balance from to nearly $2 million. However, after following one of the trades on the ASITC group message, Plaintiff lost nearly all his invested money and his Coinbridge account balance went all the way down to $12,000.

## IV.    Defendants Convince Plaintiff to Up the Stake of His Investment and Take Out Loans to Invest More Money On the Platform, Refuse Redemption Requests, and Crash Plaintiff's Trading

44.     Defendants convinced Plaintiff that if he were to increase his investment tier to SGC4, he could gain access to even more profitable trades and still make his 400% investment return. However, participation in SGC4 required the commitment of an additional $800,000 of outside capital. Defendants told Plaintiff they would be willing to make him a deal and lend him $330,000 in Coinbridge platform USDT if he could come up with the remaining $470,000 of additional outside investment capital.

45.     Plaintiff agreed to the SGC4 investment and paid ASITC an additional $470,000.

46.     On February 20, 2025, Plaintiff executed a second Investment Advisory Agreement with Coinbridge, ASITC and John Smith. The terms of the second Investment Advisory Agreement were nearly identical to the initial Investment Advisory Agreement. The only differences were the term (later start date, but the termination date remained May 1, 2025) the return target (1600% instead of 400%), the amount invested (at least $800k), the management fee (10% instead of 20%) and the removal of the "Redemption Requests" clause. Under the second Investment Advisory Agreement, "[o]nce the profit is achieved redemptions could be made at any time."

47.     Otherwise, the terms of the two Investment Advisory agreements were the same. The purpose of the agreements, scope of service, rights, responsibilities, duties, and obligations

of all parties (Plaintiff, ASITC, and Coinbridge) were identical, specifically including the fiduciary duty to "act in the best interests of [Plaintiff] at all times."

48.    On February 21, 2025 Plaintiff and ASITC entered into a loan agreement purportedly for $330,000 USDT. The Loan Agreement stated in its entirety:

**Personal Loan Agreement**

**Borrower: Brian Firestone**

**Lender: Alpha Training Center**

**1. Loan Amount: USDT 330,000.00**
To protect the legal rights of both parties, the following terms are agreed upon:
Loan

**2. Purpose and Account Restrictions**
The borrowed funds are strictly for trading purposes and may not be used for any other purposes.

**3. Trading and Fund Security**
To ensure fund security, the borrower must not engage in unauthorized personal transactions to avoid losses.

**4. Repayment Date and Interest**
The borrower must repay the full principal by March 21, 2025
If an extension is needed, written consent from the lender is required, and additional interest or fees may apply.

**5. Late Payment Liability**
If the borrower falls to repay the principal and interest on time, the lender has the right to charge 1% late interest per week until the full repayment is made

**6. Contract Effectiveness and Amendments**
This agreement takes effect upon signing by both parties and holds legal validity.
Any modifications or additions must be agreed upon in writing and signed by both parties to take effect.
This agreement is made in two copies, with each party holding one, both having equal legal validity.

49.    As soon as Plaintiff joined SGC4, his signal based trades took off and Plaintiff was once again making tremendously profitable trades. By following the instructions provided

by ASITC and Smith, Plaintiff achieved, and outperformed, the total asset return target of 1600% stated in the Second Investment Advisory Agreement. At its highest point, Plaintiff increased his account balance from approximately $800,000 to $24,500,000 on the Coinbridge platform.

50.     Having met the asset return requirement, Plaintiff was now entitled to redeem the funds in his Coinbridge account under the terms of the Second Investment Advisory Agreement. Yet, after asking to redeem portions of his now substantial holdings (on the Coinbridge platform) Defendants would not allow Plaintiff to redeem any funds from Coinbridge and turn the digital figures into actual value.

51.     Then, on March 9, 2025, Plaintiff made his largest leveraged cryptocurrency trade to date based on the following signal:



52.     However, unlike every other trade to date, Plaintiff was unable to execute and

close out the trade due to a purported system error and Plaintiff had to watch his entire
$24,000,000+ balance go down to zero.

53.    On information and belief, Defendants intentionally sabotaged Plaintiff's trade to
once again empty his Coinbridge account and entice him to invest additional outside capital.

54.    After long discussion, Defendants agreed to extend Plaintiff an additional
$1,000,000 USDT loan so that he could continue trading.

55.    On March 11, 2025, Plaintiff and ASITC entered into a loan agreement
purportedly for $1,000,000 USDT. The Loan Agreement stated in its entirety:

**PersonalLoanAgreement**

**Borrower: Brian Firestone**

**Lender: Alpha Training Center**

**1. Loan Amount: USDT 1,000,000.00**
To protect the legal rights of both parties, the following terms are agreed upon:
Loan

**2. Purpose and Account Restrictions**
The borrowed funds are strictly for trading purposes and may not be used for any
Other purposes.

**3. Trading and Fund Security**
To ensure fund security, the borrower must not engage in unauthorized personal
transactions to avoid losses.

**4. Repayment Date and Interest**
The borrower must repay the full principal by April 15, 2025
If an extension is needed, written consent from the lender must be obtained.

**4. Contract Effectiveness and Amendments**
This agreement takes effect upon signing by both parties and holds legal validity.
Any modifications or additions must be agreed upon in writing and signed by
both parties to take effect.
This agreement is made in two copies, with each party holding one, both having
equal legal validity.

56.     After executing the loan, Plaintiff began trading again and quickly recouped his losses increasing his Coinbridge account balance by several million.

**V.     Defendants Demand More Out of Pocket Money and Refuse to Allow Plaintiff to Make Payments With or Withdraw His Platform Money**

57.     As the $330,000 loan maturity came due, Defendants changed tact. Defendants began demanding that Plaintiff repay the loan with outside funds. This is directly contradictory to the terms of the Loan Agreement, which simply stated: "The borrower must repay the full principal by March 21, 2025." Given that the principal was a 330,000 USDT credit to Plaintiff's Coinbridge account, the repayment of said principal would be a 330,000 USDT debit from Plaintiff's Coinbridge account.

58.     Yet, Defendants were unwilling to budge from their demand for their payment to take the form of outside capital.

59.     Defendants began to threaten Plaintiff. They told Plaintiff that if he didn't repay the loan with outside capital, that they would stop sending him trades and would not allow him to withdraw his funds.

60.     Plaintiff made every attempt to pay as much of the loan back as he could, but could not afford to pay the full $330,000.

61.     Throughout this time, Plaintiff made multiple requests to redeem his Coinbridge account balance as was his right under the Second Investment Advisory Agreement. Defendants refused every redemption request made by Plaintiff.

**VI.     Defendants Shut Down Plaintiff's Trading Account and Delete His Portfolio Balance**

62.     After repaying $200,000 with out-of-pocket funds but unable to afford to repay the full loan amount using outside capital, Defendants continued to harass Plaintiff for payment. Defendants refused to accept Plaintiff's Coinbridge account funds or allow Plaintiff to withdraw

his Coinbridge account funds.

63.    In April 2025, Plaintiff had a Coinbridge account balance of approximately $6.6 million:



64.    However, just as the investment agreement period was set to expire on May 1, 2025, Defendants deleted his Coinbridge account and wiped his $6.6 million balance to zero.

## COUNT I

### Claim Under the Commodity Exchange Act

65.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

66.    Section 7 U.S.C. § 25 codifies a private right of action under the of the Commodity Exchange Act providing that any person who violates the Act or who willfully aids, abets, counsels, induces, or procures the commission of a violation of the Act is liable for actual damages resulting from specified transactions.

67.    Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), makes it unlawful for any person, directly or indirectly, to:

use or employ, or attempt to use or employ, in connection with any swap, or a contract of

sale of any commodity in interstate commerce, or for future delivery on or subject to the

rules of any registered entity, any manipulative or deceptive device or contrivance, in

contravention of such rules and regulations as the Commission shall promulgate by not

later than 1 year after [July 21, 2010, the date of enactment of the Dodd-Frank Wall Street

Reform and Consumer Protection Act] ....

68.    Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2017), provides:

It shall be unlawful for any person, directly or indirectly, in connection with any swap, or

contract of sale of any commodity in interstate commerce, or contract for future delivery

on or subject to the rules of any registered entity, to intentionally or recklessly:

Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice

to defraud;

Make, or attempt to make, any untrue or misleading statement of a material fact or to omit

to state a material fact necessary in order to make the statements made not untrue or

misleading;

Engage, or attempt to engage, in any act, practice, or course of business, which operates

or would operate as a fraud or deceit upon any person ...

69.    As described above, the Defendants violated Section 6(c)(1) of the Act and

Regulation 180.1 (a) by, among other things, in connection with contracts of sale of commodities

in interstate commerce, making or attempting to make untrue or misleading statements of material

fact or omitting to state or attempting to omit material facts necessary in order to make statements

made not untrue or misleading.

70.    Defendants misrepresented the nature of ASITC as an investment advisor acting

in the best interest of Plaintiff when in reality, ASITC was a fraudulent entity designed to take as much money from Plaintiff as possible without giving any value in return.

71.     Defendants misrepresented the terms of the Investment Advisory Agreements and the Loan Agreements. Defendants made false statements about their duties. Defendants made false statements about the guaranteed returns. Defendants made false statements about Plaintiff's ability to redeem money from the Coinbridge account.

72.     Defendants misrepresented the nature of Coinbridge as a legitimate exchange platform, when, upon information and belief, Coinbridge is really an entirely fake cryptocurrency exchange platform.

73.     Additionally, as described above, the Defendants violated Section 6(c)(1) of the Act and Regulation 180.1 (a) by, among other things, in connection with contracts of sale of a commodity in interstate commerce, operating a fraudulent scheme whereby they would take money from potential investors, promise valuable return, and not give anything of value in return.

74.     The Defendants engaged in the acts and practices described above willfully, intentionally, and/or recklessly.

75.     By this conduct, the Defendants violated the Commodity Exchange Act.

## COUNT II

### Claim Under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030

76.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

77.     Pursuant to the CFAA, "[a]ny person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief" where the conduct involves a loss during

any one-year period aggregating at least $5,000 in value.

78.     Defendants' unlawful actions have damaged Plaintiff in excess of $5,000 during a

period of less than one year.

79.     From January 2025 through March 2025, Plaintiff caused eleven payments to be

made in the total amount of $861,570, from Plaintiff's accounts to ASITC and Coinbridge.

80.     On information and belief these payments were taken by Defendants ASITC

and/or Coinbridge through their fraudulent scheme.

81.     Plaintiff is therefore entitled under the CFAA to compensatory damages and

injunctive and other equitable relief

## COUNT III

### Claim For Fraudulent Misrepresentation, Fraudulent Inducement, and Fraudulent Concealment

82.     Plaintiff incorporates each and every allegation set forth above as if fully set forth

herein.

83.     Defendants made false representations of facts and/or omitted material facts while

recruiting Plaintiff to join the Defendants' scheme, while executing the Investor Advisory

Agreements, throughout the term of the investment period, in connection with the Loan

Agreements, and leading up to the deletion of Plaintiff's account.

84.     Defendants misrepresented the nature of ASITC as an investment advisor acting

in the best interest of Plaintiff when in reality, ASITC was a fraudulent entity designed to take as

much money from Plaintiff as possible without giving any value in return.

85.     Defendants misrepresented the terms of the Investment Advisory Agreements and

the Loan Agreements. Defendants made false statements about their duties. Defendants made

false statements about the guaranteed returns. Defendants made false statements about Plaintiff's

ability to redeem money from the Coinbridge account.

86.     Defendants misrepresented the nature of Coinbridge as a legitimate exchange platform, when, upon information and belief, Coinbridge is really an entirely fake cryptocurrency exchange platform.

87.     Defendants' false representations were of material facts. Each fact was pertinent to Plaintiff's decision to invest with Defendants.

88.     At the time that the false representations were made, Defendants knew and/or recklessly disregarded that the representations were false.

89.     Plaintiff was ignorant of the falsity of the misrepresentations at the time they were made.

90.     Defendants made the representations with the intent that Plaintiff would rely upon them to Plaintiff's detriment and to Defendants' financial benefit.

91.     Plaintiff relied on Defendants' misrepresentations by entering into and executing the Investment Advisory Agreements and the Loan Agreements, investing with Defendants, and paying Defendants over $800,000. Plaintiff only discovered that Defendants had made false representations months after the scheme was complete and Plaintiff had nothing of value to show for his significant investments.

92.     Plaintiff's reliance on Defendants' representations damaged Plaintiff in an amount be determined at trial.

## COUNT IV

### Claim For Breach of Fiduciary Duty

93.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

94.     Defendants owed Plaintiff fiduciary duties both under the explicit terms of the Investment Advisor Agreements, in their purported roles as investment advisors, and under common law.

95.     Defendants' fiduciary duties required them to act loyally, in good faith, and with due care in the best interests of Plaintiff at all times.

96.     As alleged in detail above, Defendants failed in their duties and put their own financial interests ahead of Plaintiff's interests.

97.     Defendants, *inter alia*: (i) induced Plaintiff into a fraudulent cryptocurrency scheme; (ii) took Plaintiff's money; (iii) refused to allow Plaintiff to redeem his Coinbridge account balance; (iv) sabotaged Plaintiff's trade(s); (v) extorted cash repayments of the Loan Agreements; and (vi) deleted Plaintiff's Coinbridge account containing over $6,000,000 of USDT.

98.     Defendants' breaches of fiduciary duty caused Plaintiff damages in an amount be determined at trial.

## COUNT V

### Claim For Conversion

99.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

100.     Plaintiff owned, possessed, and/or had an ownership interest in the USDT balance in his Coinbridge account.

101.     Defendants intentionally and substantially interfered with Plaintiff's ownership of, possession of, and/or right to possess the cryptocurrency in his Coinbridge account by preventing the plaintiff from having access to the account balance or cryptocurrency, preventing

plaintiff from withdrawing cryptocurrency or making payments with cryptocurrency, and refusing to return Plaintiff's account balance or initial investment after the plaintiff demanded its return.

102.    Defendants threatened Plaintiff and solicited payment to allow him to access his account balance.

103.    Defendants ultimately blocked Plaintiff's account and deleted millions of dollars' worth of USDT in his Coinbridge account.

104.    Plaintiff did not consent to the interference.

105.    Plaintiff was damaged in an amount to be determined at trial.

## COUNT VI

### Claim For Civil Theft

106.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

107.    Plaintiff owned, possessed, and/or had an ownership interest in the USDT balance in his Coinbridge account.

108.    Defendants knowingly, and without authorization, blocked Plaintiff's access to his account balance.

109.    Defendants threatened Plaintiff and solicited payment to allow him to access his account balance.

110.    Defendants ultimately blocked Plaintiff's account and deleted millions of dollars' worth of USDT in his Coinbridge account.

111.    Defendants did so with the intent to permanently deprive the plaintiff of the use or benefit of Plaintiff's account balance.

112.    Plaintiff was damaged in an amount to be determined at trial.

## COUNT VII

### Claim for Breach of Contract

113.    Plaintiff incorporates by reference and re-alleges each and every allegation contained above as though fully set forth herein.

114.    A valid written contract exists between Plaintiff and Defendants.

115.    Defendants had a fiduciary duty to act in Plaintiff's best interest at all times.

116.    Defendants materially breached that duty by sabotaging Plaintiff's trade, changing the terms of their agreements, demanding cash payment, withholding funds, and deleting Plaintiff's account balance.

117.    This failure of payment constitutes a material breach that goes to the essence of the agreement between the parties and is so serious as to destroy the essential object of the agreement.

118.    Plaintiff was damaged in an amount to be determined at trial.

## COUNT VIII

### Claim for Breach of the Implied Warranty of Good Faith and Fair Dealing

119.    Plaintiff incorporates by reference and re-alleges each and every allegation contained above as though fully set forth herein.

120.     Every contract includes an implied covenant of good faith and fair dealing.

121.    Defendants breached the implied covenant of good faith and fair dealing by sabotaging Plaintiff's trade, forcing Plaintiff to pay additional outside cash capital, not letting Plaintiff withdraw his money from the Platform, and deleting Plaintiff's account balance.

122.    These actions by Defendants were done in bad faith because they were performed

in an attempt to extort additional out of pocket payment from Plaintiff.

123.    This breach did not fully materialize until Plaintiff refused to pay Defendants any further outside funds, Defendants refused to allow Plaintiff to withdraw funds money or make payments with his money on the Platform, and Defendants deleted Plaintiff's Coinbridge account.

124.    Plaintiff was damaged in an amount to be determined at trial.

## COUNT IX

## Claim for Unjust Enrichment

125.    Plaintiff incorporates by reference and re-alleges each and every allegation contained above as though fully set forth herein.

126.    In the alternative, if the jury should find that no contract existed between the Plaintiff and Defendants, Plaintiff brings a claim for unjust enrichment against the Defendants.

127.    Plaintiff conferred a benefit upon Defendants in the form of outside cash investment and digital cryptocurrency balance on the Coinbridge platform.

128.    Defendants retained the benefit by keeping the cash investment and account balance for themselves.

129.    Defendants denied Plaintiff's numerous attempts to collect his duly owed portion of Coinbridge account balance.

130.    Defendants retention of the cash investment and failure to pay Plaintiff his portion of his account duly owed is unjust.

131.    Therefore, Defendants have benefited at Plaintiff's expense and have been unjustly enriched.

132.    Accordingly, equity and good conscience require that Defendants pay restitution in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.      Entering judgment against Defendants for violations of the Commodities Exchange Act;

B.      Entering judgment against Defendants for violations of the Computer Fraud and Abuse Act;

C.      Entering judgment against Defendants for committing fraud;

D.      Entering judgment against Defendants for breaches of fiduciary duty;

E.      Entering judgment against Defendants for conversion;

F.      Entering judgment against Defendants for civil theft;

G.      Entering judgment against Defendants for breach of contract;

H.      Entering judgement against Defendants for breach of the implied warranty of good faith and fair dealing;

I.      Finding that Defendants were unjustly enriched at the expense of Plaintiff;

J.      Awarding Plaintiff all of their compensatory damages and/or restitution to be proved at trial which Plaintiff has suffered as a result of Defendants' violations of the Commodities Exchange Act, the Computer Fraud and Abuse Act, fraudulent conduct, conversion, civil theft, breaches of contract, breaches of the implied covenant of good faith and fair dealing, and/or unjust enrichment, plus pre-judgment and post-judgment interest and costs;

K.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and/or

L.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.


Dated: June 11, 2025

Respectfully submitted,

**HACH ROSE SCHIRRIPA
& CHEVERIE, LLP**

_/s/ Frank R. Schirripa_
Frank R. Schirripa
Daniel B. Rehns (_pro hac forthcoming_)
John W. Baylet (_pro hac forthcoming_)
112 Madison Avenue, 10th Floor
New York, New York 10016
Tel: 212-213-8311
fschirripa@hrsclaw.com
drehns@hrsclaw.com
jbaylet@hrsclaw.com

_Attorneys for Plaintiff_